**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **THOMAS JAMES NEGRI,** | § | |
| | § | |
| **v.** | § | **A-11-CV-106-SS** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal Justice–** | § | |
| **Correctional Institutions Division,** | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE SAM SPARKS
      UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner Thomas J. Negri's pro se Petition for Writ of Habeas Corpus (Document 1), Amended Brief in Support for 28 U.S.C. § 2254 Habeas Corpus (Document 32), Answer with Brief in Support of Respondent, Rick Thaler, Director of the Texas Department of Criminal Justice, Correctional Institutions Division (Document 35), and Petitioner's Reply (Document 37). For the reasons set forth below, the undersigned concludes that the petition should be denied.

**STATEMENT OF THE CASE**

**I.    PROCEDURAL HISTORY**

The Director has custody of Negri pursuant to a judgment and sentence of the 33rd District Court of Llano County, Texas, in Cause Number CR-5740, styled *State of Texas v. Thomas James*

*Negri*. *Ex parte Negri*, Application No. WR-75,565-01, at 9.[1]  Negri was charged by indictment with committing the first-degree felony offense of murder.  1 C.R. at 9.  On July 20, 2007, a jury found him guilty and sentenced him to a term of imprisonment of twenty years.  *Ex parte Negri*, Application No. WR-75,565-01, at 9, 12.

Negri filed a timely appeal, and the Third Court of Appeals affirmed his conviction in an unpublished opinion.  *Negri v. State*, No. 03-07-00588-CR, 2009 WL 1255572 (Tex. App.–Austin May 6, 2009, pet. ref'd).  His subsequent pro se petition for discretionary review was refused by the Texas Court of Criminal Appeals.  *Negri v. State*, PDR No. 0877-09 (Nov. 4, 2009).  Negri then filed a state habeas application on February 3, 2011, raising the following claims:  (1) ineffective assistance of counsel for failure to investigate various witnesses and their statements, as well as certain areas of evidence; (2) ineffective assistance based on failure to cross-examine on key issues, ask defense witnesses key questions, obtain a DNA expert, and mention exculpatory evidence at closing; (3) ineffective assistance based on failure to object to inadmissible evidence; (4) ineffective assistance based on failure to obtain a DNA expert; (5) selective prosecution; and (6) ineffective assistance of appellate counsel.  *Ex parte Negri*, Application No. WR-75,565-01, at 17, 22-27.  The Texas Court of Criminal Appeals denied the application without written order on May 4, 2011.  *Id.* at cover.  On February 2, 2011, Negri filed his petition in this Court.  Pet. at 9.  Negri subsequently

---

[1]  Citations to pleadings and documents in the state-court habeas record appear as *Ex parte Negri*, Application No. WR-75,565-01, followed by a page number.  [#] C.R. at [#] indicates a reference to the Clerk's Record in the state trial court, and [#] R.R. at [#] indicates citation to a particular volume and page number of the Reporter's Record of the trial.

filed an amended brief setting out all of his claims.  *See* Am. Br. in Supp. for 28 U.S.C. § 2254

Habeas Corpus (Nov. 4, 2011) (Document 32).[2]

## II.   FACTUAL BACKGROUND

The Third Court of Appeals summarized the evidence at Negri's trial as follows:

### *Shirley Cowan's Disappearance*

The deceased, Shirley Cowan, was appellant's mother-in-law.  Cowan disappeared without a trace in January 2001.  The indictment accusing appellant of Cowan's murder was filed in December 2005, and he was tried in July 2007.

At the time of her disappearance, Cowan, a sixty-year-old widow, was living in a trailer park in Austin.  Cowan had two daughters, Karen Jack, who lived in Rockport, and Teresa Negri, appellant's wife, who lived with him and their children in Burnet.[1]  By all accounts, Cowan had a quick temper and could be difficult to deal with.  For example, Cowan did not speak to appellant or Teresa for four years in the mid-1990s as a result of hard feelings arising from a failed business arrangement between Cowan, her late husband, and appellant.  In 2000, however, Cowan hired appellant to be the general contractor on a "spec" house she wanted to build on a golf course near Kingsland.  By January 2001, the house was nearing completion, but there was testimony that Cowan was not satisfied with the quality of the work, and that she was planning to remove appellant from the job and replace him with her brother-in-law, Nelson Cowan.

> [1] Cowan's third child, a son, predeceased her. We spell all names as they appear in the reporter's record.

Cowan was last seen by Natasha Stieler, Karen Jack's daughter and Cowan's granddaughter, who also lived in Austin.  Stieler testified that she was very close to Cowan, spoke to her at least once a week on the telephone, and often visited her.  Stieler had dinner at Cowan's residence on Sunday night, January 14, 2001.  Stieler testified that she brought two rented movies with her that night and that she and Cowan watched one of them after dinner.  They made plans to meet again for dinner on Wednesday night, when they would watch the second movie.  Cowan promised to make spaghetti, one of Stieler's favorite dishes, and Stieler saw Cowan take some ground meat from the freezer to thaw.

---

[2] In response to Negri's First Motion to Amend the Pleadings (Aug. 19, 2011) (Document 20), the Court directed Negri to include all of his claims in his to-be-filed brief in support of his petition.  *See* Order (Aug. 22, 2011) (Document 22).

On Monday or Tuesday, Stieler heard from her mother that, according to appellant, Cowan had called appellant on Sunday night and told him that she had decided to go to "the islands."[2]  Stieler testified that she found this odd because Cowan had said nothing to her to indicate that she was planning to take a trip, and that she had seen no luggage or other evidence of travel plans.  Stieler was further surprised to hear that Cowan had left her two dogs behind in appellant's care rather than taking them with her, as she always did when she traveled.[3]  Later that week, Stieler borrowed the key to Cowan's trailer from Teresa Negri so she could retrieve her rented movie, which she had left at the trailer in anticipation of the Wednesday night dinner.  Stieler testified that when she entered the trailer, she "knew something was wrong."  Cowan was, according to Stieler, a fastidious housekeeper, but the dirty dishes from the previous Sunday night were still in the sink and the ground meat was beginning to go bad in the refrigerator.

> [2]  There is evidence that Cowan often vacationed in the Cayman Islands.

> [3]  The two dogs had belonged to Cowan's late son, and all the witnesses who knew Cowan testified to her great love for the animals.

Karen Jack testified that she, too, was surprised to learn that Cowan had suddenly decided to go on vacation.  According to Jack, Cowan would not have left without telling Jack of her plans, and she would not have left her dogs.  Jack also testified that appellant told her that Cowan had instructed him to move her trailer and car from the trailer park.  This concerned Jack because, as she explained, "[Appellant] told me that she was coming back on the 29th.  Where was she going to live and how was she going to get off this airplane if her trailer and her car [were] gone."  Jack testified that appellant and Teresa moved Cowan's trailer and car from the trailer park on January 23.[4]  The evidence shows that they first took the trailer to the building site near Kingsland, and later moved it to their residence in Burnet.  Jack testified that appellant later told her that Cowan had instructed him to sell the trailer because she was out of money.  On January 31, 2001, Jack called the police to report Cowan missing.

> [4]  John Rucks, the trailer park manager, testified that Cowan's rent was paid, and that she had said nothing to him about leaving.

Nelson Cowan testified that he last saw his sister-in-law on January 11, 2001.  On that day, he drove Cowan to Kingsland to look at the house under construction.  Cowan expressed to him her displeasure with appellant's work–she was "mad as hell"–and her desire to have Nelson finish the project.  Nelson also drove Cowan to appellant's house, where she intended to ask Teresa to return the extra key to Cowan's safe deposit box.  Nelson testified that Cowan told him she had

$300,000 in the box.  The bank manager testified that Cowan had leased the safe deposit box in October 2000, and that only Cowan and Teresa Negri were authorized to open it.  Bank records showed that Cowan was the only person to open the box until January 16, 2001, when Teresa opened it for the first time.  Teresa also opened the box on January 31 and February 14, 2001.

Texas Ranger Matthew Linderman, who led the investigation into Cowan's disappearance, testified that Cowan's telephone records showed that the last call made with her phone was on the night of January 14, 2001, to appellant's phone number.  There was no record of Cowan or anyone else using her telephone or her credit cards since that date.  The only checks written on Cowan's bank account after her disappearance were signed by appellant, who was authorized to do so.

### *Blood at the Kingsland House*

Bob Holbrook testified that he was hired by appellant to do the cabinets at the Kingsland house.  Holbrook was present when, after the cabinets had been hung and painted, Cowan visited the house with appellant.  Cowan did not like the color and demanded that the cabinets be repainted.  Holbrook said that appellant told him not to worry and that appellant would pay him to repaint the cabinets.  Holbrook testified that he could hear appellant and Cowan talk as they walked through the house that day, and she was "pretty upset about quite a few things in the house."  Holbrook testified that Cowan was "real short" and "abusive" with appellant.  Holbrook said that Cowan's remarks did not seem to bother appellant, who "just kind of stood back and nodded his head like everything was okay.  If she wanted anything redone, it was fine to redo it, you know, everybody be paid, no problems."

Holbrook testified that appellant called him one day when the house was nearing completion and instructed him not to come to work the next day, which Holbrook believed was a Saturday.  Appellant told Holbrook that he and Cowan were going to meet to discuss the "finish-ups" and last payment, and that he wanted the meeting to be private.  Appellant asked Holbrook to come back on Sunday to finish his work, and Holbrook agreed.  Holbrook testified that when he returned to the job on Sunday, he noticed that the cabinets had been dented in several places.  He also noticed "speckles" on the cabinets, which he suspected was paint mold.  Holbrook saw a large amount of white paint on the unfinished concrete floor of the house.  As described by Holbrook and other witnesses, and shown by photographic evidence, this paint formed a trail that ran from the kitchen, through the living room, and into the master bedroom closet.  Holbrook testified that he noticed small spots of red or brown color in the paint.

Holbrook testified that he asked appellant, when he arrived at the house that same day, what had happened the day before.  According to Holbrook, appellant told him

that he and Cowan had "a little altercation in the kitchen." As appellant described it, Cowan "swung at [appellant] with a piece of pipe and he ducked back, she missed him, and she cut her hand on the edge of that cabinet facing and had walked from the kitchen into that–through the living room into the master bedroom into the closet crying." Appellant told Holbrook that Cowan had been embarrassed by this incident, and that she told appellant she was going to go on vacation and come back when the house was completed.

Benita Blare, who was then married to Holbrook and often helped him on his jobs, testified that she remembered Holbrook calling her from the Kingsland job site–she recalled the day as a Tuesday–to report the damage to the cabinets. Blare drove to the site and examined the damage. Blare testified that the cabinets "were busted on the top half of the cabinet and towards the floor on the side part of the cabinet." In addition, "there were these little speckles along the cabinet that looked like somebody had deliberately taken a paint brush with white paint and just dabbed them on his cabinets and in that white paint was black circles." Blare also noticed the trail of white paint that ran from the kitchen to the bedroom closet. Blare testified that the white paint covered the floor of the closet, as if "somebody had taken a whole gallon of white paint and just dumped it on the floor." Blare said that the paint trail did not appear to be an accidental spill, but "very deliberate." Blare testified that she touched some of the "black spots" on the cabinets and in the paint trail, and "it was definitely blood."

Bryan Thurman testified that he was hired by appellant to install the carpet and floor tile at the Kingsland house. Thurman said that appellant called him on a Saturday night and asked if he could start work the next day. When Thurman arrived at the site, the carpet padding had already been installed. This, according to Thurman, was "a real backwards way of doing things." Appellant told Thurman that he had put down the padding "to speed the process of the job up." Thurman recalled that there was white paint on the kitchen floor, and that it looked as if someone had spilled the paint and rolled or mopped it rather than clean it. Thurman testified that he asked appellant if he wanted Thurman to scrape up the paint before laying the tile, and appellant told him not to. Appellant told Thurman that he was in a hurry to finish the house before his mother-in-law returned from her vacation.

Ranger Linderman testified that appellant never told him about the argument he claimed to have had with Cowan in the kitchen, or that Cowan had cut her finger while trying to strike appellant with a pipe. Linderman also testified that appellant never mentioned the trail of white paint, and that its existence was brought to his attention by appellant's children. Linderman, Travis County Sheriff's detective Chris Orton, and other officers subsequently conducted two searches of the Kingsland house. On May 4, 2001, the carpet and padding were pulled back to reveal the paint on the floor of the living room and bedroom. On May 21, 2001, some of the tile in

the kitchen was removed to reveal the paint on the floor of that room.  Photographs of the paint trail and the cabinets made during these searches were introduced in evidence.

The officers testified that luminol spray and other presumptive tests of the paint trail were positive for blood.  Orton testified that the largest amount of paint was on the closet floor in the master bedroom.  Orton said that when luminol was sprayed on this paint, "the way it lit up, it looked–what I saw was a body in the fetal position."  Orton testified that in his opinion, someone still alive had lost a substantial amount of blood while lying in the closet.  Orton's description of this luminol image was confirmed by Joseph Flores, an evidence technician who participated in the search.

The investigators took a large number of scrapings from the paint trail.  They also removed portions of the wallboard in the kitchen containing suspected blood spots.  Subsequent laboratory tests confirmed that the spots in the paint and on the wallboard were blood.  A DNA expert testified that by using a sample of Karen Jack's saliva, he was able to determine with 99.9 percent certainty that the blood found in the house was Cowan's.  A few of the blood spots contained a mixture of Cowan's DNA and DNA from another unidentified person.  Appellant's DNA was not found in any of the samples taken from the house.

### Raymond Russell

Raymond Russell was the electrical subcontractor at the Kingsland house.  Russell testified that he spoke to Cowan only once, soon after appellant hired him, and that she expressed the opinion that he was not working fast enough.  Either that same day or a few days later, appellant told Russell, after a meeting with Cowan, that "he would be better off if she were dead."  As Russell recalled the conversation, he replied, "[Y]eah, you can't live with them and you can't kill them.  And [appellant] said yeah, you can; and I said, well, no there ain't nobody worth going to prison for; and he said, well, if they never find a body, you don't have to worry about it."

Russell also remembered seeing the white paint on the floor of the house.  He noticed it on a day when he went to the job site to retrieve a roll of wire and a conduit bender, a tool which he described as a "three-quarter-inch pipe" about four feet long that is "threaded on one end with a handle end on the other."  Cowan's car was parked in the driveway, preventing Russell from backing in his truck.  Appellant, who was there, told Russell that he was driving Cowan's car because his truck "was in kind of bad shape."  Russell testified that he could not find his conduit bender.  Russell said that he returned to the house a few days later to install some fixtures and plugs.  The carpet padding was already down, which he said was "a little unusual because you get little snips of wire and junk under the padding, you know, it's hard to sweep up."

John Rucks, the manager of the trailer park where Cowan lived, testified that he recalled seeing a gray-haired, gray-bearded man driving Cowan's car. Russell acknowledged that he had a full, gray beard at the time he was working at the Kingsland house. Mike Holbrook (no relation to Bob Holbrook) testified that during the summer of 2001, he argued with Russell at a bar over money Russell owed him. Holbrook said that Russell became "verbally abusive" and said, "I'll bury you just like I buried that old woman." Another witness confirmed Holbrook's account. Russell testified that he did not know where Cowan lived and never drove her car except to move it once at the Kingsland construction site. Russell denied making the statement attributed to him by Mike Holbrook. At the time of appellant's trial, Russell was serving a prison sentence for the aggravated assault of his wife.[5]

> [5] The evidence reflects that Russell was convicted in 1995 and placed on probation. That probation was revoked in 2002.

### Missing Person Report

Heidi Fisher, the supervisor of the Texas Department of Public Safety's missing persons clearinghouse, testified that when a person is reported missing, her office conducts database searches, coordinates with other law enforcement agencies, and disseminates information to news organizations in an effort to generate leads. In February 2005, four years after Cowan disappeared, the clearinghouse received a telephone call from Joyce Nash, who lived in Dayton, in East Texas. Nash had seen a photograph of Cowan at the clearinghouse website and believed that she might have seen Cowan in a Dayton store. Fisher testified that she told Linderman about Nash's call, and that she followed up the call by arranging to have stories about Cowan, with photographs, run in Dayton-area newspapers. This effort produced no leads.

Nash, called by the defense, testified that she was 99 percent certain that the person she saw in 2005 was Cowan. She acknowledged during cross-examination, however, that she told Linderman in 2005 that she had hesitated to call and that the person she saw "might just be someone that looked like [Cowan]."

*Negri*, 2009 WL 1255572, at *1-5.

## III.    NEGRI'S CLAIMS FOR RELIEF

Negri contends that he is entitled to habeas relief based on the following grounds:

1.    He was denied effective assistance at trial when his defense attorneys failed to:

    a.    investigate and impeach Lloyd Raymond Russell's testimony;

8

      b.      subpoena Officer Bill Boyd to testify;*[3]

      c.      investigate and interview other witnesses from the bar where Russell allegedly made an incriminating statement;

      d.      impeach Mike Holbrook at trial;

      e.      impeach Karen Jack regarding the new car purchased three weeks after her mother disappeared;

      f.      investigate and present Negri's finances to the jury, as well as evidence of valuable jewelry still in the victim's home and that nothing was missing from her storage unit;

Am. Br. at 1-7.

2.      He was denied effective assistance at trial when his defense counsel failed to object to Nelson Cowan's testimony and a bank employee's testimony on the basis of hearsay and relevancy. Am. Br. at 8-13.

3.      He was denied effective assistance at trial when his defense counsel failed to obtain and present an expert witness on DNA at trial. Am. Br. at 25-32.

4.      Negri raises various claims arising from three jurors communicating with the trial judge on the courthouse steps to express that they had trouble understanding some of the questioning. Am. Br. at 14-18. Negri asserts that he was denied his right to a fair and impartial jury when the trial court failed to order a mistrial. *Id.** He contends that he was also denied this right when the trial court gave an improper jury instruction to address the jurors' complaint. *Id.** Negri also contends that his trial counsel was ineffective for failing to request a mistrial after hearing that the jurors contacted the judge, and for the failures to object to the trial court's curative jury instruction and to request a mistrial based on the instruction. *Id.* at 17.*

     Negri also claims that he was denied the right to a fair trial by an improper jury charge, a failure to comply with state statute requiring twelve jurors for a felony conviction, and a failure to comply with a state statutory requirement that when a verdict is rendered by less than the entire jury, it must be signed by the individual concurring members of the jury. Am. Br. at 19-21.*

5.      Negri raises various claims arising from publicity. He claims that the trial court abused its discretion in failing to sua sponte order a mistrial as a result of publicity. Am. Br. at 22-24.* Negri also asserts that his attorneys were ineffective in failing to move for a mistrial based on publicity. *Id.**

---

[3] The claims that include a "*" are claims for which the Director asserts a procedural bar based on a failure to exhaust.

6.    The evidence was insufficient to sustain his conviction.  Am. Br. at 33-44.

7.    The conviction was obtained through selective prosecution in violation of Negri's equal protection rights.  Am. Br. at 45.

8.    Negri received ineffective assistance of counsel on appeal through a failure to assert obvious errors on appeal and communicate with Negri.  Am. Br. at 46-47.

*See also* Pet. at 7-10.

## IV.   EXHAUSTION OF STATE REMEDIES, STATUTE OF LIMITATIONS, AND SUCCESSIVE PETITION

The Director contends that Negri did not exhaust his state court remedies, as required by 28 U.S.C. § 2254(b) and (c), for the following claims and they are therefore procedurally defaulted:  (1) ineffective-assistance claim based on defense counsel's failure to subpoena Officer Bill Boyd to testify; (2) claims arising from the communication between three jurors and the trial-court judge on the courthouse steps; and (3) claims related to the need for a mistrial as a result of publicity.  Answer at 1-2 & n.1, 11-15.  The Director further asserts that Negri does not qualify for the possible exceptions from the exhaustion requirement because he fails to establish cause and prejudice, and because he fails to show that he is actually innocent of the crime for which he was convicted.  *Id.* at 14-15.  Accordingly, the Director urges the Court to conclude that Negri's unexhausted claims are barred under the federal procedural default doctrine.

In response, Negri asserts that he has shown good cause for the failure to exhaust, pointing to problems with getting copies of his transcripts and that he suffers from seizures that adversely affect his memory.  Reply at 1-3.

The Director does not suggest that the remainder of Negri's claims are untimely or subject to the successive petition bar.  Answer at 1-2 & n.1, 11-15; *see also* 28 U.S.C. § 2244(b), (d).

10

**DISCUSSION**

**I.     REVIEW UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996**

The Supreme Court has summarized the basic principles that have grown out of the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act. *See Harrington v. Richter*, 562 U.S. –, –, 131 S. Ct. 770, 783-85 (2011). The Court has noted that the starting point for any federal court in reviewing a state conviction is 28 U.S.C. § 2254, which states in part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Court has further noted that "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington*, 562 U.S. at –, 131 S. Ct. at 784.

One of the issues *Harrington* resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id.* Following all of the Courts of Appeals' decisions on this question, *Harrington* concluded that the deference due a state court decision under § 2554(d) "does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (citations omitted). The Court noted that it had previously concluded that "a state court need not cite or even be aware of our cases under

§ 2254(d)." *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (*per curiam*)).

When there is no explanation with a state-court decision, the habeas petitioner's burden is to show

there was "no reasonable basis for the state court to deny relief." *Id.* And even when a state court

fails to state which of the elements in a multi-part claim it found insufficient, deference is still due

to that decision, because "§ 2254(d) applies when a 'claim,' not a component of one, has been

adjudicated." *Id.*

As *Harrington* explained, § 2254(d) permits the granting of federal habeas relief in only three

circumstances: (1) when the earlier state court's decision "was contrary to" federal law then clearly

established in the holdings of the Supreme Court; (2) when the earlier decision "involved an

unreasonable application of" such law; or (3) when the decision "was based on an unreasonable

determination of the facts" in light of the record before the state court. *Id.* at 785 (citing 28 U.S.C.

§ 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000)). The "contrary to"

requirement "refers to the holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions

as of the time of the relevant state-court decision." *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir.

2000) (quotation and citation omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on
> a question of law or if the state court decides a case differently than . . . [the Supreme
> Court] has on a set of materially indistinguishable facts.

*Id.* at 740-41 (quotation and citation omitted). Under the "unreasonable application" clause of

§ 2254(d)(1), a federal court may grant the writ "if the state court identifies the correct governing

legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to

the facts of the prisoner's case." *Id.* at 741 (quotation and citation omitted). The provisions of

§ 2254(d)(2), which allow the granting of federal habeas relief when the state court made an "unreasonable determination of the facts," are limited by the terms of the next section of the statute, § 2254(e).  That section states that a federal court must presume state-court fact determinations to be correct, though a petitioner can rebut that presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  But absent such a showing, the federal court must give deference to the state court's fact findings.  *Id.*

## II.   NEGRI'S CLAIMS

Having independently reviewed the state-court record and Negri's asserted claims, the undersigned concludes that the claims identified by the Director as exhausted in state court are indeed procedurally barred in this Court.  With regard to the remaining claims, the undersigned concludes that there is nothing unreasonable or contrary in the state court's application of clearly established federal law or in its determination of facts in light of the evidence, as discussed below.

### A.   Procedurally Defaulted Claims

As already explained, the Director contends that the following of Negri's claims were procedurally defaulted:  (1) ineffective-assistance claim based on defense counsel's failure to subpoena Officer Bill Boyd to testify; (2) claims arising from the communication between three jurors and the trial-court judge on the courthouse steps; and (3) claims arising from the need for a mistrial as a result of publicity.  Answer at 1-2 & n.1, 11-15; *see also* Am. Br. at 14-24.  Negri asserts that he has shown good cause for the failure to exhaust, pointing to problems with obtaining copies of transcripts and contending that he suffers from seizures that adversely affect his memory.  Reply at 1-3.  Negri has not sufficiently exhausted his state remedies, as required by 28 U.S.C. § 2254(b) and (c), with regard to these claims.

The exhaustion doctrine requires that state courts be given the initial opportunity to address, and if necessary, correct alleged deprivations of federal constitutional rights. *See Castille v. Peoples*, 489 U.S. 346, 349, 109 S. Ct. 1056, 1059 (1989); *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 277 (1982). The guiding rule is that the prisoner must "fairly present" the "substance" of his claim to the state courts. *Picard v. Connor*, 404 U.S. 270, 276, 92 S. Ct. 509, 512-13 (1971); *Anderson*, 459 U.S. at 6, 103 S. Ct. at 277. In order for a claim to be "fairly presented" and thus exhausted, the state-court system must have been presented with the "same facts and legal theory" or the "substantial equivalent" of the federal habeas claim. *Picard*, 404 U.S. at 275, 278, 92 S. Ct. at 512, 513; *see also, e.g., Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006). To satisfy the exhaustion requirement, a claim must be presented to the highest court of the state for review, which in Texas is the Texas Court of Criminal Appeals. *See, e.g., Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985). To proceed before that court, a petitioner must either file a petition for discretionary review, Tex. R. App. P. 68.1, or an application for a post-conviction writ of habeas corpus, Tex. Code Crim. P. art. 11.07. Finally, the claim must have been presented to the state's highest court in a procedurally correct manner. *Castille*, 489 U.S. at 351, 109 S. Ct. at 1060.

Negri did not raise the above-described claims in his petition for discretionary review or state application for writ of habeas corpus. *See Negri v. State*, PDR No. 877-09, Pet. for Discretionary Review (Oct. 13, 2009) (raising only sufficiency-of-evidence, venue, and selective prosecution challenges); *Ex parte Negri*, Application No. WR-75-565-01, at 22-27 (state habeas application) (Feb. 3, 2011)) (raising ineffective assistance based on failure to investigate various witnesses and other evidence, deficient trial performance, failure to object to inadmissible evidence, and failure to obtain a DNA expert witness, ineffective assistance of appellate counsel, and selective prosecution);

14

*see also Negri v. State*, No. 03-07-00588-CR, Appellant's Br. (Mar. 18, 2008) (raising only sufficiency-of-evidence and venue challenges).  In the state habeas court, Negri's only complaint that possibly resembles one of the claims identified as unexhausted above was part of an ineffective assistance claim in which Negri asserted that his trial counsel should have moved for a mistrial.  *See Ex parte Negri*, Application No. WR-75-565-01, at 51 (habeas application); *see also id.* at 22-27 (same); *id.* at 36-58 (Br. in Supp. for Article 11.07 Habeas Corpus) (Feb. 22, 2011)).  But the state-court ineffective-assistance claim that referenced a failure to move for a mistrial did not involve a publicity basis for a mistrial, as is now presented in this Court, *see* Am. Br. at 22-23, but instead relied on a failure to object to purportedly inadmissible evidence, *Ex parte Negri*, Application No. WR-75-565-01, at 51.  This claim is distinct from Negri's current claim in this Court regarding a failure of counsel to seek a mistrial based on publicity.  *See Anderson*, 459 U.S. at 6, 103 S. Ct. at 277 ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (citations omitted); *Picard*, 404 U.S. at 276, 92 S. Ct. at 512 ("The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts.").

In filing a federal habeas application with the complaints described, Negri deprived the state habeas court of the opportunity to consider and pass on those claims and failed to satisfy the exhaustion requirements.  When a petitioner presents unexhausted claims for federal habeas review, the general rule that a state court must explicitly apply a procedural bar in order for federal review to be precluded does not apply and this Court may determine the claim to be procedurally barred under state law.  *Coleman v. Thompson*, 501 U.S. 722,  735 n.1, 111 S. Ct. 2546, 2557 n.1 (1991).  If the state court to which a petitioner would be required to present his unexhausted claims would

find those claims to be procedurally barred, the federal procedural default doctrine precludes federal habeas review. *Id.* A petitioner, however, may still obtain federal habeas review of a claim that would be denied by the state court on the grounds of procedural default if he can show cause and actual prejudice for the procedural default or that a failure to address the merits of the federal claim would result in a miscarriage of justice. *Moore v. Roberts*, 83 F.3d 699, 702 (5th Cir. 1996) (citing *Coleman*, 501 U.S. at 750, 111 S. Ct. at 2565).

If this Court were to require Negri to return to the Texas Court of Criminal Appeals to present his unexhausted claims and satisfy the exhaustion requirement, that court would find those claims to be procedurally barred under the Texas abuse of the writ doctrine. *See* TEX. CODE CRIM. P. art. 11.07 § 4 (prohibiting the consideration of the merits of, or granting relief based on, a writ application filed after the final disposition of an inmate's first state habeas application unless he demonstrates the statutory equivalent of cause or actual innocence); *see also, e.g., Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred); *Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997) (same). Even if Negri's grounds for cause were sufficient, he fails to show actual prejudice as the result of the alleged violations of federal law that are the basis for the various claims, and has made no showing that a failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750, 111 S. Ct. at 2565. The federal procedural default doctrine thus bars Negri from raising his unexhausted claims in this Court.

**B.      Ineffective Assistance of Trial Counsel**

Negri asserts several ineffective-assistance-of-trial-counsel claims.  Ineffective assistance of counsel claims are analyzed under the well-settled requirements set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064.

For the first requirement, the proper measure of attorney performance is "simply reasonableness under prevailing professional norms."  *Id.* at 688, 104 S. Ct. at 2065.  In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential.  *Id.* at 686-89, 104 S. Ct. at 2064-65.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689, 104 S. Ct. at 2065.  Indeed, the Supreme Court has established that counsel should be "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and cautioned against an "'intrusive post-trial inquiry into attorney performance'" and the "'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence.'"  *Cullen v. Pinholster*,

– U.S. –, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688-90, 104 S. Ct. at 2065-66).

For the second requirement, the question is whether there is a reasonable probability that, absent the alleged error, the result of the proceeding would have been different, a question that must be considered in the context of the entire evidence. *Strickland*, 466 U.S. at 694-95, 104 S. Ct. at 2068-69. A reasonable probability is "'a probability sufficient to undermine confidence in the outcome,'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068), which requires a "'substantial,' not just 'conceivable,' likelihood of a different result," *id.* (quoting *Harrington*, 562 U.S. at –, 131 S. Ct. at 791).

Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a substantial likelihood that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*; *Strickland*, 466 U.S. at 688, 694, 104 S. Ct. at 2064, 2068. Because a habeas petitioner must satisfy both *Strickland* requirements to demonstrate ineffective assistance, a failure to establish either deficient performance or prejudice makes it unnecessary to consider the other requirement. *Id.* at 697; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

In addition to the "highly deferential" view that the Court takes of counsel's performance under *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, the Court is also limited in its examination of such claims by the "'deferential lens of § 2254(d).'" *Pinholster*, 131 S. Ct. at 1404 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2, 129 S. Ct. 1411, 1419 n.2 (2009)). In this way, the Court's review of the state habeas court's determination of ineffective assistance claims is "'doubly'"

deferential. *Harrington*, 562 U.S. at –, 131 S. Ct. at 788 (quoting *Knowles*, 556 U.S. at 123, 129 S. Ct. at 1420).

As discussed below, Negri's ineffective-assistance claims fail to satisfy *Strickland* and the AEDPA's prerequisites.

### 1.    Various Trial Errors Regarding Witness Examination and Evidence Presentation

Negri argues that he received ineffective assistance of trial counsel because his defense counsel failed to investigate and prepare for key issues at trial.  Am. Br. at 1-7.  Specifically, Negri complains that his attorneys:  (1) failed to impeach Lloyd Raymond Russell with possible financial motives for killing Cowan, his statement to Mike Holbrook that he "w[ould] bury him like he did that old lady," and his failure to report Negri's alleged statement that "you won't have to worry about it, if they never find a body" when interviewed by investigators; (2) failed to interview other witnesses who were at the bar when Russell made the statement; (3) failed to question Karen Jack about how she was able to buy a new car three weeks after her mother disappeared; and (4) failed to present evidence about Negri's financial situation after the victim's disappearance.  *Id.*  The Director argues that the record establishes that Negri's defense counsel thoroughly cross-examined the witnesses on most of the issues that Negri raises, Answer at 21-26, and that rather than impeach Mike Holbrook, Negri's defense counsel strategically used Holbrook to undermine Russell's credibility.  *Id.* at 28-29.  The Director further contends that to the extent Negri's attorney may have chosen not to ask a particular question or to impeach a witness, Negri both fails to overcome the established presumption that such a decision was not the result of a reasoned trial strategy and show deficient performance under *Strickland*.  *Id.* at 21, 29.  With regard to the purported failure to

interview witnesses who were at Pat's Bar, the Director asserts that Negri failed to show that there were any witnesses that his attorney failed to investigate, what an investigation would have revealed, and how it would have changed the outcome of the trial.  *Id.* at 27.  In response to Negri's complaint that his attorney should have presented evidence of Negri's finances after Cowan's disappearance and asked Karen Jack about purchasing a new car after her mother's disappearance, the Director points to defense counsel's strategic decision to instead challenge the prosecution witnesses and show their financial motives for killing the victim.  *Id.* at 29-30.

### a.    Lloyd Raymond Russell

On direct examination, Russell offered damaging testimony about a conversation that he had with Negri one day when Negri was upset after seeing Cowan.  6 R.R. at 155.  According to Russell, Negri told Russell that Negri would be better off if Cowan were dead.  *Id.*

> I said, yeah, you can't live with them and you can't kill them.  And he said yeah, you can; and I said, well, no, there ain't nobody worth going to prison for; and he said, well, if they never find a body, you don't have to worry about it.

*Id.* at 156.  Russell added that it seemed like Negri was "just blowing off ste[a]m" when he said it, and "[i]t didn't seem like it was a big deal."  *Id.*

The record shows that Negri's defense attorney attempted to undermine any credibility that Russell may have had.  First, trial counsel argued at some length that he should be entitled to make known to the jury Russell's entire criminal history, including details regarding an aggravated assault conviction.  *Id.* at 171-81.  When the court denied the request, he offered an unsuccessful bill of exceptions.  *Id.* at 173-76.  Negri's counsel persisted with this argument despite the fact that he had already suggested to the jury during his earlier cross-examination of Ranger Linderman that Russell had been found guilty of aggravated assault with a deadly weapon.  4 R.R. at 164.  Negri's trial

counsel managed to present the information to the jury again anyway, repeatedly reminding them that Russell was a convict, who could serve up to twenty years for the felony offense of aggravated assault, and who could not be trusted.  6 R.R. at 195-96, 205-08.  Indeed, trial counsel ended his cross-examination by asking Russell when he entered the penitentiary system and whether his time in the Texas prison system improved his ability to remember things and tell the truth.  *Id.* at 207-08.

Moreover, in cross-examining Russell as to Negri's alleged statement that he did not need to worry if a body was not found, defense counsel highlighted that Russell never shared Negri's inculpatory statements in three separate investigation interviews in 2001, 6 R.R. at 191-94, and that the investigators characterized him as "uncooperative and agitated," *id.* at 193.  Under defense counsel's questioning, Russell admitted that he did not share the purported statement with police until just a few days before trial.  *Id.* at 194.  Negri complains that his attorney should have impeached Russell with the absence of the alleged statement in Detective Orton and Ranger Linderman's investigation reports, Am. Br. at 3, but Negri's attorney instead elicited a direct admission that Russell had never reported the statement until a few days prior to trial.

Trial counsel also attempted to raise doubts about Russell's testimony by asking Russell about the timing of his damaging statement about not finding the body when he was facing a revocation for violating his probation, and whether he offered to Ranger Linderman to threaten Negri with a gun if Linderman could get him out of jail.  *Id.* at 196.  Russell denied going to Linderman, but under questioning, Russell finally admitted that he did ask for Linderman's help:

> Q.  You called to see if he in his position as a law enforcement officer might stand up and help you, didn't you, sir?
> A.  I'm sure I did.
> Q.  You made an offer to try to help them, right?
> A.  I may have, but I don't remember saying what you're saying that I said.

Q.  Well, in that moment that you were seeking his help did you bother telling him at that moment what you've told these 12 people over here today?  And that is that Tom Negri made some statement to the affect of–in response to your statement that you can't live with them, you can't kill them, and he said, yes, you can, and then if they never find a body, you don't have to worry or words to that affect?  Remember?

. . .

A.  No, sir.  I did not.  Now I told you previously that I had not told him anything about this or anybody else until last Friday.

*Id.* at 198-99.  Thus, Negri's counsel repeatedly called into question Russell's credibility in relation to his testimony.  Defense counsel also went on to challenge Russell's testimony that Ranger Linderman did not promise to put in a good word with the parole board or the local D.A.  6 R.R. at 202-04.  In short, Negri's attorney made a substantial effort to undermine Russell's credibility.

Defense counsel also specifically cross-examined Russell as to whether he made the statement to Mike Holbrook that "you w[ould] bury him just like he did that old lady."  *Id.* at 182.  After Russell denied it, defense counsel suggested that the jury compare the credibility of other witnesses such as Texas Ranger Linderman with Russell's credibility.

Q.  Never said that, did you sir?
A.  No, I did not.
Q.  And if there were two, three, four people that came in this courtroom and said that was–to the contrary, they would be lying; is that correct, sir?

*Id.*  Defense counsel even asked, "This gentleman over here–I guess he stepped out right now–Mr. Linderman, you ever catch him lying to you?"  *Id.* at 184; *see also id.* at 185 (sustaining objection to approach to impeaching Russell's credibility through exploring Russell's assertion that law enforcement had lied to him).  Defense counsel also directly challenged Russell's version of how his fingerprints got on the victim's steering wheel.  6 R.R. at 199-202.

Trial counsel extensively cross-examined Russell.  Regarding Negri's complaint that his attorney should have also questioned Russell about a financial motivation for killing the victim,

22

Negri fails to substantiate potential financial benefits to Russell in that scenario.  Further, he fails to overcome the presumption that his counsel made a reasonable strategic decision in pursuing damaging credibility factors to undermine Russell's testimony instead of a vague financial motive possibly suggestive of an alternative perpetrator.  Lastly, Negri fails to make the requisite prejudice showing under *Strickland*.

### b.      Witnesses at Pat's Bar

Negri claims that his defense attorneys failed to interview witnesses who were at Pat's Bar when the fight occurred between Russell and Holbrook and Russell made the "bury him" statement.

Counsel has a duty to make reasonable investigations or to make reasonable decisions that particular investigations are unnecessary.  *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066.  Counsel is not, however, required to pursue fruitless avenues.  *Id.*  When assessing the reasonableness of an attorney's investigation, a court considers how much evidence is already known to counsel and if the known evidence would lead a reasonable attorney to investigate further.  *See, e.g., Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005).  To establish that an attorney was ineffective for failure to investigate, a habeas petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.  *Id.*; *Gray v. Lucas*, 677 F.2d 1086, 1093 (5th Cir. 1982).

Negri fails to specify what further investigation of the bar incident would have revealed and how it would have changed the outcome of the trial, or even that there were any witnesses that his counsel failed to investigate.  He also fails to explain how the witnesses called by his attorney were not sufficient.  Negri's defense attorney called Mike Barrow, who was present during the fight at Pat's Bar, to testify favorably for the defense.  8 R.R. at 217.  Barrow testified that Russell and Mike

Holbrook had a dispute over Russell's failure to pay for work that Holbrook had done on Russell's motorcycle.  *Id.* at 218.  Barrow then testified that he heard Russell say, "I'll bury you just like I buried that old woman," as Russell was leaving the bar. 8 R.R. at 219.  Negri's attorney also called Mike Holbrook, the other party to the verbal altercation, to testify.  7 R.R. at 110-11.

Negri's assertion that his attorney failed to investigate or call witnesses who were present when the incident occurred is not supported by the record.  He also fails to show that there were any relevant witnesses other than Mike Barrow and Mike Holbrook who should have been called and that such witnesses would have testified favorably for Negri and changed the outcome of the trial.

### c.     Mike Holbrook

Negri also asserts that his attorney's performance was ineffective because he failed to impeach Mike Holbrook with several issues, specifically, a drug conviction, statements to the police, and his motivation for lying.  Am. Br. at 5.

Mike Holbrook was a witness presented in the prosecution's case-in-chief, but his testimony was favorable to Negri in suggesting a possible alternate perpetrator.  7 R.R. at 104-07.  Holbrook testified that in the summer of 2001, he confronted Russell at Pat's Bar about being paid for working on Russell's motorcycle.  *Id.* at 107.  In the heated exchange, according to Holbrook, Russell said that he would bury Holbrook "like he did that old woman."  *Id.* at 111.

Negri's attorney did not attempt to impeach Mike Holbrook's credibility, but instead, used this witness to highlight Russell's potentially inculpatory statement and emphasize Russell's lack of credibility.

> Q.  . . . And you knew him not as Lloyd Raymond Russell, but his name was Ray Russell, right?
> A.  We called him Worthless Ray.

Q.  Okay.  And y'all didn't call him Worthless Ray because he was not worthless, you [called] him that because he was worthless, right?
A.  Yes.
Q.  Okay. He's just a sorry guy; would you agree?
A.  Yes, sir.
Q.  Dishonest, correct?
A.  Yes, sir.

*Id.* at 108.

Negri fails to explain how his attorney was ineffective for failing to impeach Holbrook's credibility, particularly in light of the fact that his overall testimony was favorable to Negri and critical of Russell.  In addition, Negri fails to undermine the presumption that his attorney's cross-examination of Holbrook was the result of a reasoned trial strategy.  Lastly, Negri makes no showing of prejudice.

### d.    Karen Jack

Negri asserts that his defense attorney was ineffective for failing to question Karen Jack, the victim's daughter, about how she was able to buy a new car three weeks after her mother disappeared.  Am. Br. at 5.  Negri fails to show how this was relevant.  Negri's defense counsel chose to cross-examine Jack on issues pertaining to her credibility, such as her attempt to probate a version of her mother's will that left everything to her, even though that will had been declared null and void by a later will that left everything to her sister.  7 R.R. at 84-99.

Negri fails to show that his attorney's decision not to ask specific questions regarding whether and how Jack bought a car after her mother disappeared was not part of a reasonable trial strategy.  Negri also fails to show the requisite prejudice under *Strickland*.

### e.      Negri's Financial Situation

Negri argues that his counsel was ineffective based on a failure to prepare a defense using Negri's finanical status to rebut the theory that Negri murdered Cowan for the $300,000 in her safety deposit box.  Am. Br. at 6-7.  He argues his attorney should have demonstrated that Negri did not spend money on luxuries after Cowan's disappearance and actually had little money.  Negri fails to overcome the presumption that his attorney's choice not to emphasize Negri's financial situation after Cowan's disappearance was the result of a reasoned trial strategy.  Further, Negri fails to offer any concrete evidence to demonstrate that his counsel even could have even presented such a defense, and such evidence might have actually supported an inference by the jury that Negri needed money.

Rather than focus on Negri's financial situation, Negri's defense counsel chose to attack the prosecution witnesses and show their financial motives for killing the victim.  *See, e.g.*, 7 R.R. at 86-98 (cross-examination of Karen Jack, which focused on her attempt to probate Cowan's will and self-appointment as guardian of her mother's estate); 8 R.R. at 143 (cross-examination of Nelson Cowan, which attempted to show that he was not being truthful in his statement to the jury that Shirley Cowan had $300,000 in her safety deposit box, based on his failure to mention it to Detective Orton); *id.* at 140-43 (follow-up questions to Nelson Cowan designed to show that the victim trusted Teresa Negri, Negri's wife, and continued to permit her a key to her safety deposit box).  Moreover, Negri fails to establish that any emphasis by the prosecution on a financial motive was critical to the jury's verdict. Negri does not show that the decision not to demonstrate Negri's financial situation to the jury is not entitled to the presumption of a reasonable trial strategy under *Strickland*.  Negri also fails to show the requisite prejudice under *Strickland*.

For all of Negri's points in attempted support of his ineffective-assistance claims, he fails to show that his trial counsel is not entitled to the presumption that the decisions were part of a reasoned trial strategy.  Likewise, he does not demonstrate either objectively unreasonable attorney performance or prejudice to his case.  Negri also fails to show, as required by *Strickland* and the AEDPA, that the state court acted unreasonably or contrary to the established law of *Strickland* in rejecting Negri's *Strickland* claims.  *See* 28 U.S.C. § 2254(d).[4]  These claims should be denied.

### 2.      Hearsay and Relevancy Objections

Negri contends that he was denied effective assistance at trial when his defense counsel failed to object on the basis of hearsay and relevancy to the testimony of a bank employee that Negri's wife Teresa had access to the victim's safety deposit box as well as testimony by Nelson Cowan regarding Teresa's key to the safety deposit box.  Am. Br. at 8-13.  The Director argues that the record shows that Negri did make a hearsay objection to Nelson Cowan's testimony regarding the safety deposit

---

[4]  The Director also addresses a claim that Negri's attorneys were ineffective in failing to impeach the credibility of Ranger Linderman and Detective Orton's investigations with the omission from reports of Russell's statement to Mike Holbrook that "he would bury him like he did that old woman," Answer at 25-26, although the Director does not include such a claim in the list of Negri's claims, *id.* at 1-2.  The undersigned does not ascertain such a claim in reviewing Negri's petition and briefing, but to the extent that there is such a claim, it also fails.

Trial counsel asserted in his opening statement that the evidence would show that law enforcement officials failed to investigate Russell's statement to Mike Holbrook.  3 R.R. at 44. Furthermore, in his cross-examination of Detective Orton of the Travis County Sheriff's Department, who initially investigated the case before it was transferred to the Texas Rangers, defense counsel asked Orton if he ever interviewed Mike Holbrook, if Linderman looked into the statement and incident as Pat's Bar, and if the statement had been investigated, whether it would have been reflected in documentation.  3 R.R. at 114-18; *see also* 3 R.R. at 167 (asking Orton if he knew Mike Holbrook).  In his cross-examination of Mike Holbrook, Negri's attorney asked if Linderman had ever interviewed Holbrook about Russell's statement, and attempted to leave the jury with the impression that the investigation was not thorough, despite the fact there is no dispute that investigators interviewed Russell multiple times.  7 R.R. at 108-11.  Holbrook explained that he had reported the statement to Officer Bill Boyd.  *Id.*  Any claim that Negri's attorney overlooked this issue is not supported by the record.  Moreover, Negri fails to demonstrate the requisite prejudice.

box.  Answer at 31-32.  He also asserts that Negri's attorney cannot be adjudged deficient for not objecting to the bank employee's testimony on the basis of hearsay because her testimony was admissible under the business records exception to the hearsay rule.  *Id.* at 32-33.  With regard to Negri's complaint that his attorney should have made a relevancy objection to both witnesses' testimony, the Director contends that Negri fails to show that such an objection would have been sustained or that his attorney's decision not to object was not strategic.  *Id.* at 33.

The record undermines Negri's claim that his attorney failed to make a hearsay objection to Nelson Cowan's testimony concerning the safety deposit box.  Early in his  testimony, Negri's attorney objected on the basis of hearsay when Cowan attempted to state what Shirley Cowan had said to him.  8 R.R. at 119.  After the court explained to Cowan the gist of the hearsay rule, the prosecution was able to admit some of what Shirley Cowan said to Nelson Cowan based on the state-of-mind exception to the hearsay rule. *Id.* at 119-20.  When Nelson Cowan began to testify regarding the safety deposit box, Negri's defense counsel made a hearsay objection, and the trial court limited Cowan's testimony on this topic to his observations.  *Id.* at 123.  Negri's assertion that his attorney failed to object to this testimony is not supported by the record, and this claim should be denied.

Negri's argument that his attorney was ineffective for failing to object to the bank employee's testimony is also without merit.  The trial transcript shows that the manager of the bank, Nita Milliorn, testified regarding who had access to Shirley Cowan's safety deposit box under the business records exception to the hearsay rule, following an objection from defense counsel.  *Id.* at 104-08.  Referring to business records, Milliorn testified that there were two keys to Shirley Cowan's safety deposit box and Teresa Cowan had one of the keys.  *Id.* at 107.  Given the business-records exception, Negri fails to show that a hearsay objection would have been sustained and thus fails to

show deficiency or prejudice as required by *Strickland*. Admissible testimony cannot be the basis for attributing deficient performance to trial counsel. *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007) ("counsel cannot have rendered ineffective assistance of counsel by failing to make an objection that would have been meritless"); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

Negri also contends that his attorney should have objected to Nelson Cowan and Milliorn's testimony because the prejudicial effect of their testimony outweighed the probative value under Rule 403 of the Texas Rules of Evidence. Am. Br. at 11-12. But Negri again fails to show that such an objection had merit, or that his attorney's decision not to object was not a strategic choice to instead attack the credibility of the witness and the substance of the testimony through cross-examination. Rather than raise an objection that would likely have been denied, Negri's attorney sought to undermine the testimony in cross-examination by emphasizing that Shirley Cowan trusted Teresa Negri enough to give her a key to the safety deposit box and never revoked her access to it. 8 R.R. at 111. Negri's attorney also emphasized that no funds had been reported missing from Cowan's checking account at the bank. *Id.* at 112. With his cross-examination of Nelson Cowan, Negri's attorney attempted to show the jury that he was biased and on the side of the family that thought Negri was guilty, and he attempted to impeach Cowan by highlighting omissions in his original statement to Detective Orton about Shirley Cowan's retrieval of the safety deposit box key from Teresa, whether Shirley Cowan removed Teresa's name from the lease agreement to the safety deposit box, and Shirley Cowan's possession of $300,000 in her safety deposit box. *Id.* at 138-43. Negri fails to overcome the presumption that his attorney was making reasonable strategic decisions in not raising Rule 403 objections.

Because Negri fails to demonstrate that the state habeas court's rejection of these ineffective-assistance-of-counsel claims involved an unreasonable application of the established law of *Strickland*, or one contrary to that established law, the Court should deny relief. *See* 28 U.S.C. § 2254(d).

### 3.    DNA Expert

Negri argues that his attorneys' failure to obtain and present an expert witness on DNA at trial constituted ineffective assistance of counsel. Am. Br. at 25-32.

Negri's claim is essentially one of an uncalled witness. *See Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. *See id.*; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Thus, petitioners making claims of ineffective assistance based on the failure to call a witness must demonstrate prejudice by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense." *Woodfox*, 609 F.3d at 808 (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)). This requirement applies to both lay and expert uncalled witnesses. *Id.*

Negri fails to comply with this requirement and instead offers only speculation regarding the possible benefits and testimony of a DNA expert witness at trial. He does not identify any particular expert witness, actual information, or expert opinions that could have been offered and would have been useful to his defense. In addition, part of Negri's complaint is that his defense counsel did not properly prepare for trial in relation to DNA issues and should have used the expertise of a DNA

expert.  Am. Br. at 28.  Again, he fails to offer support for his assertion.  In fact, it appears that defense counsel did secure a DNA expert consultant and there is no evidence that defense counsel did not utilize a consultant in preparation for trial; indeed, Negri references and submits part of a report from the independent DNA laboratory that was requested by his defense law firm.  *Id.* at 26 & Ex. E.

Finally, in order to establish the requisite prejudice, Negri is required to show more than a mere possibility that counsel's errors could have affected the outcome of the trial, and must show a reasonable probability of a different outcome.  *See, e.g., Woodfox*, 609 F.3d at 809.  He does not show, however, how in the context of the evidence and witnesses at trial, there was a reasonable probability that but for defense counsel's failure to present a separate DNA expert, the jury would not have convicted Negri.

There is no indication that the state habeas court's rejection of this claim involved an unreasonable application of established federal law, or one contrary to that established law.  The Court should deny relief.  *See* 28 U.S.C. § 2254(d).

## C.     Sufficiency of the Evidence

Negri contends that the evidence was insufficient to support his conviction, specifically, that the blood and DNA evidence do not support his conviction.  Am. Br. at 33-44.  He also argues that the evidence points to the culpability of other people–Lloyd Raymond Russell, Karen Jack, Bob Holbrook, or Natasha Steiler.  *Id.* at 39-41.  The Director argues that Negri fails to establish that the state appellate court's rejection of Negri's sufficiency-of-the-evidence claim was objectively unreasonable as required by the AEDPA.  Answer at 34-38.

As reviewed, under the AEDPA, habeas relief is available only if Negri demonstrates that the state court's adjudication of his claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court precedent, or if he demonstrates that the state court's adjudication was the product of an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The Third Court of Appeals was the last state court to issue a written opinion on this claim. When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest on the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594-95 (1991). In this case, the Texas Court of Criminal Appeals denied Negri's petition for discretionary review without an opinion. Because the Third Court of Appeals issued "the last reasoned opinion" on the matter, this Court "looks through" the Texas Court of Criminal Appeals's order to the Third Court's decision. *Id.* at 803, 111 S. Ct. at 2594.

In rejecting Negri's argument that the evidence was legally insufficient to support the murder conviction, the Third Court of Appeals concluded that the evidence was sufficient to satisfy the Supreme Court's legal standard for sufficiency.

### *Legal Sufficiency*

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard applies in both direct and circumstantial evidence cases. *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992). In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

32

The corpus delicti of murder is established if the evidence shows the death of a human being caused by the criminal act of another.  *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993).  Appellant does not dispute that Cowan is dead, but he contends that the State failed to prove that she was intentionally killed.  We disagree.  Cowan's sudden and total disappearance, the discovery of Cowan's blood at the Kingsland house, and the obvious effort to hide that blood are more than sufficient to warrant the conclusion beyond a reasonable doubt that Cowan was the victim of an intentional homicide.

Appellant argues that if Cowan was murdered, the evidence gives stronger support to the theory that Russell was the murderer.  Appellant asserts that Russell "had the opportunity, the violent temperament, and admitted his crime before two eyewitnesses," the latter assertion a reference to the statement, denied by Russell, about burying "the old woman."  Appellant also suggests that Russell was the bearded man seen by Rucks driving Cowan's car.  Appellant contends that the only reason he was accused of the murder, and not Russell, is that the investigating officers arbitrarily decided to build their case against appellant.

Appellant's argument fails because, in essence, he asks us to review the evidence in the light most favorable to Russell's guilt, rather than in the light most favorable to the jury's verdict.  Although the evidence cited by appellant might cast a shadow of suspicion on Russell, it was not unreasonable for the jury to discount that evidence and to conclude instead that appellant murdered Cowan.  Russell had no obvious motive to kill Cowan, while appellant was shown to have several:  the money his wife stood to inherit, the souring of this business relationship with Cowan, and the anger he felt as a result of Cowan's many complaints about the quality of appellant's work.  Moreover, appellant's attempt to shift the blame to Russell fails to account for the circumstances that most incriminate appellant:  (1) appellant's story that he and Cowan had an argument in the kitchen during which she cut herself and then hid in the bedroom closet, which was an obvious attempt to explain the presence of Cowan's blood in the house, and (2) appellant's story that Cowan called him to say that she was going on vacation, a call she could not have made if she were dead.  Appellant would have had no reason to tell these stories if Russell had murdered Cowan.

Viewing the circumstantial evidence in the light most favorable to the verdict, the jury could reasonably conclude that:  (1) appellant brought Cowan to the Kingsland house and bludgeoned her in the kitchen, possibly with Russell's missing conduit bender, damaging the cabinets and splattering blood in the process; (2) appellant carried or dragged Cowan from the kitchen to the bedroom closet, where she bled and died; (3) appellant tried to hide Cowan's blood on the cabinets and floor with paint and, when that did not work, made up the story about Cowan cutting herself during an argument and hiding in the closet in embarrassment; and (4) to explain Cowan's sudden disappearance, appellant also made up the story about the telephone call

33

announcing her sudden decision to take a vacation. The evidence is legally sufficient to sustain the jury's verdict convicting appellant of Cowan's murder. Issue one is overruled.

*Negri*, 2009 WL 1255572, at *5-6.

In *Jackson v. Virginia*, the Supreme Court established the standard for a state prisoner's challenge to the sufficiency of the evidence in a federal habeas proceeding as "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (citation and quotation omitted). All credibility choices and conflicts in inferences are to be resolved in favor of the verdict. *See, e.g., Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005). The question is whether the evidence is constitutionally sufficient to support the conviction, which simply requires that the evidence merely satisfy the "'substantive elements of the criminal offense as defined by state law.'" *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991) (quoting *Jackson*, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16). Finally, in addition to the deference required by the AEDPA, a state appellate court's review of the sufficiency of the evidence is entitled to great deference. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993); *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985).

Negri's argument that the evidence was insufficient to support his conviction amounts to mere disagreement with the factfinder's resolution of the evidence. The evidence was more than sufficient to support the verdict, as explained by the Third Court of Appeals, and its determination to deny relief on this claim was not in conflict with clearly established federal law nor did it involve an unreasonable application of established federal law. *See* 28 U.S.C. § 2254(d). The Court should deny habeas relief on this claim.

### D.    Selective Prosecution

Negri contends that the Llano County District Attorney, Sam Oatman, selectively prosecuted him instead of Russell because, he asserts, Negri fathered a son with Mr. Oatman's wife at some point in the past.  Am. Br. at 45.   The Director counters that this claim should be rejected as conclusory because Negri failed to put forth any evidence in support of the claim.   Answer at 39.

Decisions regarding whom to prosecute are committed to the prosecution's discretion unless "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights."   *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 1531 (1985) (citations and quotation omitted).  The Supreme Court has explained the requirements for a claim of selective prosecution:

> The decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.  In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary. . . . The requirements for a selective-prosecution claim draw on ordinary equal protection standards.  The claimant must demonstrate that the [] prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.

*United States v. Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 1486-87 (1996) (citations and quotations omitted); *see also United States v. Kahl*, 583 F.2d 1351, 1353 (5th Cir. 1978) (explaining that a criminal defendant must show "first, that others similarly situated generally have not been prosecuted; and second, that the Government's prosecution of him is selective, invidious, in bad faith or based on impermissible considerations such as race, religion, or his exercise of constitutional rights.").

Negri fails to provide evidence that he was selectively prosecuted for murder.   He relies on a failure to prosecute another particular individual, Lloyd Ray Russell, but Negri's argument does

not support his claim since Russell was not similarly situated to Negri, in that circumstantial evidence pointed to Negri as the responsible actor. Because Negri did not make a showing that a similarly situated individual was not prosecuted, he fails to establish that the prosecutorial decision had a discriminatory effect or that it was motivated by a discriminatory purpose. It is clear that "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). As in *Ross*, the record does not support Negri's contention that he was selectively prosecuted.

It cannot be said that the state habeas court unreasonably applied the law of selective prosecution, applied it in a way contrary to precedent, or relied on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court should deny this claim.

### E. Ineffective Assistance of Appellate Counsel

Negri contends that he received ineffective assistance of counsel on appeal because his appellate counsel failed to consult with him before filing the briefing in the Third Court of Appeals and because he failed to raise the issues that Negri presents in his habeas petition in this Court. Am. Br. at 46-47. The Director asserts that Negri's appellate counsel had no obligation to consult with him and that Negri fails to show that his appellate counsel should have raised a particular issue that was stronger than the issues presented, or that the appellate court would have reviewed any of the record-intensive ineffective-assistance claims that Negri now raises. Answer at 39-42.

To succeed on an ineffective-assistance-of-counsel-on-appeal claim, a petitioner must satisfy the two requirements set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *See*

*Smith v. Robbins*, 528 U.S. 259, 286, 120 S. Ct. 746, 764 (2000).  A petitioner must demonstrate that appellate counsel was deficient, and that the deficiency prejudiced his appeal.  *See id.* at 285, 120 S. Ct. at 764.  To demonstrate the first requirement, deficiency on the part of counsel, a petitioner must show that counsel "fail[ed] to find arguable issues to appeal–that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."  *Id.* at 286, 120 S. Ct. at 764.  Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Id.* at 288, 120 S. Ct. at 764 (citing *Jones v. Barnes*, 463 U.S. 745, 103 S. Ct. 3308 (1983)).  Thus, it is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."  *Id.* at 288, 120 S. Ct. at 765 (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  To demonstrate that a failure to raise an issue was deficient, a petitioner must show that a particular nonfrivolous issue was clearly stronger than issues that counsel did present.  *Id.* 288, 120 S. Ct. at 765-66.

Under the second *Strickland* prerequisite, appellate counsel is ineffective when counsel's errors are also prejudicial, that is, when there is a reasonable probability that but for the error, the ultimate result would have been different.  To demonstrate prejudice, a petitioner must show that, but for appellate counsel's deficient performance, he would have prevailed on appeal.  *Smith*, 528 U.S. at 285-86, 120 S. Ct. at 764.

Negri's claim fails because it does not satisfy either *Strickland* requirement.  Appellate counsel is not required to raise every conceivable argument urged by his client, regardless of merit.  *Id.* at 288, 120 S. Ct. at 765.  It is appellate counsel's duty to assess and choose among potential

issues, according to his or her professional judgment of their merits and the strategic approach being taken.  *Jones*, 463 U.S. at 751-52, 103 S. Ct. at 3312-13.  There is no indication that Negri's appellate attorney was doing anything other than focusing on the arguments with the most potential for success, and Negri fails to identify a particular issue that was stronger than the issues counsel did present.

In addition, Negri also fails to show the requisite prejudice.  He does not show that the arguments that he asserts should have been included in his direct appeal were either adequately preserved for direct appeal or had merit, *see supra* II.A-.D, and prejudice cannot be demonstrated by a failure to raise meritless issues on appeal.  *See, e.g., United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Williams v. Collins*, 16 F.3d 626, 634-35 (5th Cir. 1994) (when issue is without merit, failure to raise issue on appeal cannot satisfy *Strickland*'s prejudice requirement).  As a result, Negri fails to show that but for his appellate counsel's failure to raise the claims at issue, he would have prevailed on appeal.

Because Negri does not demonstrate that the state court's rejection of his claim of ineffective assistance of appellate counsel was an unreasonable or contrary application of clearly established federal law, his claim should be denied.  *See* 28 U.S.C. § 2254(d).

## RECOMMENDATION

It is recommended that Negri's application for writ of habeas corpus be denied.

## CERTIFICATE OF APPEALABILTY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability."  28 U.S.C.

38

§ 2253(c)(1)(A).  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).  In cases in which a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Negri's petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003) (citing *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604).  Accordingly, it is respectfully recommended that the Court not issue a certificate of appealability.

### OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.

The district court need not consider frivolous, conclusive, or general objections. *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall also bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 29th day of May, 2012.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE